# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Adams Township, | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 2023 C.D. 2014 |
| | : | Argued: November 17, 2015 |
| Richland Township; Cambria County; | : | |
| Watkins Glen Properties, Inc.; | : | |
| Clarann Hillenbrand, Dorian Frazier | : | |
| and JoAnne Frazier; Debra Kuhne; | : | |
| Thomas Costa and Pamela Costa; | : | |
| David Anderson and Jean Anderson; | : | |
| Robert Burnworth and Mary Burnworth; | : | |
| Roy Lowry and Debra Lowry; Virginia | : | |
| Chapman; Berwind Corporation; | : | |
| Paul Singer; Vincent Maxwell and | : | |
| Jessica Maxwell; and Nancy Leone | : | |

BEFORE:  HONORABLE MARY HANNAH LEAVITT, Judge
　　　　　HONORABLE P. KEVIN BROBSON, Judge
　　　　　HONORABLE ANNE E. COVEY, Judge

OPINION BY JUDGE BROBSON　　　　　　　FILED:  December 18, 2015

Appellant Adams Township (Adams) appeals from an order of the Court of Common Pleas of Cambria County (trial court).  The trial court appointed a Board of Commissioners (Board) to determine the boundary between Adams Township (Adams) and Richland Township (Richland).[1]  The Board concluded

---

[1] This matter began when Adams initiated a declaratory judgment action against Richland, seeking to have the trial court determine the boundary line.  Richland filed preliminary objections to the complaint, and the trial court determined that the complaint constituted a request under Section 302 of the Second Class Township Code, Act of May 1, 1933, P.L. 103, *as reenacted and amended*, 53 P.S. § 65302, which, in pertinent part, provides that a trial court,
**(Footnote continued on next page…)**

that the Cambria County tax assessment/GIS[2] map should constitute the boundary line. The trial court accepted the Board's recommendation. Adams filed exceptions to the trial court's order, which the trial court dismissed.[3] We vacate the trial court's order and remand the matter to the trial court for further proceedings.

At the outset, we note some key factual details concerning this matter and legal principles concerning the duties of boards of commissioners in performing the task of determining a boundary between municipalities. First, this Court has held that there is no allocation of a burden of proof in such matters. *Moon Twp. v. Findlay Twp.*, 553 A.2d 500, 503 (Pa. Cmwlth. 1989), *appeal dismissed*, 587 A.2d 311 (Pa. 1991). Thus, in a sense, such proceedings cannot be characterized as adversarial in the way of traditional party litigation. Second, as the Board properly noted throughout its hearings, its authority under Section 302 the Second Class Township Code (Code)[4] does not extend to it the power to determine a *fair* boundary when two municipalities disagree about their borders.

---

**(continued…)**

upon petition, may "require the lines or boundaries between two or more townships to be ascertained."

[2] "GIS" apparently is a reference to the mapping technology known as Geographic Information Systems.

[3] The trial court's September 22, 2014 order also directed the Cambria County Tax Office to provide the trial court with "a metes and bounds description of the Cambria County GIS tax assessment line." The trial court entered its final decree on October 13, 2014, ordering that the Cambria County tax assessment/GIS map constituted the boundary between Adams and Richland.

[4] Act of May 1, 1933, P.L. 103, *as reenacted and amended*, 53 P.S. § 65302.

Rather, its duty is to attempt to determine *the original boundary* at the inception of one or two municipalities.

In this case, Richland existed before Adams, and, in 1870, Adams was carved out of Richland. (Board Decision Finding of Fact (F.F.) no. 1.) The Board here faced a daunting task in seeking to determine the location of the original boundary line, because the "creation document" developed and filed in the Cambria County Court files[5] in 1870 (and which would have presumably provided an exact method of determining the boundary line) has been missing for an indeterminate period of time, and no duplicates of that document were made. (F.F. no. 2.) The Board, nevertheless, did a commendable job in seeking to fulfill its obligation, conducting three hearings, during which it considered evidence from surveying experts offered by Adams and Richland.

Adams offered the testimony of Frederick Brown, a professional surveyor. Mr. Brown testified that he performed a survey of the Adams/Richland boundary in or about 2005. Mr. Brown indicated that Adams and Richland had hired him because the townships were the putative defendants in an auto accident matter and disputed their liability, based upon the indefinite location of the accident. Mr. Brown testified that he relied, in part, upon a survey performed around 1930, involving a boundary dispute among several municipalities, including Richland and Conemaugh Township. That survey, referred to as the S.E. Dickey Survey, was not intended to establish the original Adams/Richland boundary, but it depicts the most northerly point where Adams and Richland meet

---

[5] "Order of Cambria County Courts on January 5, 1870, as shown in the Quarter Sessions Docket Volume 1, Page 9." (F.F. no. 1.)

as located *southwest* of the confluence of two rivers, one of which is the South Fork River. (Reproduced Record (R.R.) at 193a.) Mr. Brown testified regarding four purported "monuments" that he believed reflected or aided in determining the northernmost point where the two municipalities conjoin. Mr. Brown testified that, in his opinion, the monuments and mathematical information available to him enabled him to confirm the northernmost point, using a monument identified in the S.E. Dickey survey and information therein indicating the distance to the end of the boundary between Conemaugh Township and Richland. Mr. Brown testified that the owner of property in the proximity of that point informed Mr. Brown that a monument existed very close to that northern point (the Myers field monument), leading Mr. Brown to opine that the former monument confirmed his conclusion regarding the northernmost point as between Adams and Richland. Mr. Brown also testified regarding a monument on the Bloom property, which is directly south of the northern point as determined by Mr. Brown, which also confirmed his belief that a line connecting the monuments, if continued southward, would eventually lead to the initial southernmost point where the two townships join.

Mr. Brown found support for this theory based upon differentiations in macadam on two roads crossing the township boundary south of the Bloom monument, which would roughly (within fifteen or so feet) match the proposed boundary line if completed south to Somerset County. Mr. Brown also testified that he believed the authorities who set the original boundary line may have also relied upon visual physical identifiers that Mr. Brown explained were commonly used for creating boundaries, namely geo-physically high elevations, which permitted surveyors to create boundaries based on sighting of hilltops across valleys. (R.R. at 30a.) Mr. Brown testified, however, that although he believed

4

that the original boundary was a straight line, at some point the boundary had been altered at the southern end, such that the boundary veered off in a straight line that lead in a southeasterly direction, which can be seen on Adams Exhibit 3 (R.R. at 440b). Mr. Brown could not explain how this deviation came to be, but he reasoned that it represented a deviation from the original boundary.

Richland offered the testimony of David Kalina, a professional surveyor. Although Mr. Kalina did not conduct his own survey, he explained that he researched the history of the boundary and found documents dating back to 1872, which he believed supported his view that the northernmost point at which Adams and Richland join is a point northeast of the point identified by the S.E. Dickey survey and by Mr. Brown. Mr. Kalina testified that he found an atlas of the area that reflected the work of a surveyor who placed the most northern point between the two townships at or closer to the confluence of the South Fork River. Mr. Kalina opined that this atlas, as well as other documents developed by authorities, including the Pennsylvania Department of Highways (now the Department of Transportation), similarly placed the point farther north than Mr. Brown's survey. Mr. Kalina agreed that the original boundary between Adams and Richland is a straight line, but he found a reference to the "Hoffman Farm" at the southern end of Cambria County and northern end of Somerset County, which appeared to Mr. Kalina to be the point where the two municipalities (Adams and Richland) met. Mr. Kalina reasoned generally that the older records upon which he relied were more reliable than the newer, post-1930 documents upon which

5

Mr. Brown relied, because they were created closer in time to the date of the creation of the original boundary.[6]

There is no evidence of record suggesting that any part of the tax assessment map line developed by Cambria County can be traced to the original boundary line established in 1870. Although it is clear that the tax assessment map line runs roughly in the same general area as the line Mr. Brown found to be the original boundary, there is no direct evidence in the record regarding the creation of that line. In fact, the two experts who referenced actual historical and/or documentary support for their positions agree that there is no foundation to support a determination that the Cambria County tax assessment line is the original boundary line.

As reflected in certain exhibits, especially Exhibit 18 (R.R. at 506b),[7] the lines suggested by Mr. Brown and Mr. Kalina would have varying effects on individual property owners in Adams and Richland. The line proposed by Mr. Brown would have the effect of moving at least six individuals and one large tract (Watkins Glen Properties) from Richland (or part of Richland in the case of Watkins Glen Properties) into Adams. (Exhibit 12, R.R. at 453b.) Mr. Brown's

---

[6] Thomas and Pamela Costa, who own property in the area of the disputed boundary line, offered the testimony of Jerry Thomas, a surveyor. Mr. Thomas did not conduct a survey. Rather the gist of his *legal* opinion was that the townships, by failing to contest the boundary used for tax assessment purposes (as developed by Cambria County) or to seek to establish the original boundary for so many years, had lost the right to challenge the use of the Cambria County tax assessment map as the official boundary that the townships used, albeit erroneously, for so many years.

[7] Exhibit 18 illustrates the differences among the two experts' opinions and the tax assessment map. Mr. Brown's proposed boundary is highlighted in blue/green, Mr. Kalina's boundary is highlighted in pink, and the tax assessment line is highlighted in orange/brown.

6

survey would also result in the movement of several properties from Adams into Richland. (*Id*.) Also, because Mr. Brown's survey placed the boundary line in a manner that crossed through the apparent middle of four properties, it appears that the situs of those properties would have to be determined based upon factual information, such as the location of improvements on the properties. (*Id*.; Notes of Testimony of Sarah H. Reasbeck, R.R. at 107a.) Mr. Kalina confirmed that his proposed boundary would result in hundreds of properties being moved from Adams to Richland.

The Board specifically found that "Mr. Brown's proposed line [is] the most reasonable analysis and alternative to the current boundary line." (F.F. no. 22.) The Board, however, also found that it was "unable to find sufficient supporting evidence in the record, when weighing all factors, including, but not limited to credibility of all witnesses, to support any Board determination that the 'Brown line' is the original 1870 boundary line." (F.F. no. 23.) The Board specifically also found that "the other expert opinions [are] speculative, mere conjecture and self-serving interpretations of select documents and reflect a disregard of any existing unsupporting documentation and records." (F.F. no. 24.) The Board found that "[t]here are official governmental records that refute each expert's opinion of the location of the boundary line." (F.F. no. 25.) The Board found that insufficient evidence existed for the Board to determine where the original boundary line is. (F.F. no. 26.)

The Board also considered equitable principles in its decision. First, the Board determined that Richland failed to demonstrate any facts that would indicate prejudice or acquiescence on the part of the townships that would estop Adams from asserting a different boundary line. (F.F. no. 27.) The Board,

7

however, determined that "there were substantial improvements by the property owners affected by the dispute, which were reasonably induced by the long acquiescence of the current boundary line, which is based upon the tax assessment maps." (F.F. no. 29, 31.) The Board concluded that "[t]he Doctrine of Estoppel warrants a determination that the boundary line between Adams Township and Richland Township should be located at its current location as reflected on the Cambria County tax assessment/'GIS' records." (F.F. no. 32.)

The Board considered, but did not address, Adams' claim that Richland was collaterally estopped from challenging the Brown line, based upon the fact that Richland authorized the S.E. Dickey survey upon which Brown relied. The Board concluded that the doctrine did not apply in this case based upon its conclusion that the individual property owner/plaintiffs had established a basis upon which to apply estoppel with regard to their own properties. (Board Decision at 16.) The Board reasoned that "[t]he private property owners should not be prejudiced by th[e] lack of official records, especially considering Adams Township's long delay in challenging the currently existing boundary line." (*Id*.)

The trial court, in considering the exceptions Adams filed to the Board's report, rejected Adams' arguments, dismissed the exceptions, and confirmed the Board's report. After obtaining a metes and bounds description of the boundary as set forth on the Cambria County tax assessment/GIS map, the trial court entered a final order establishing that line as the boundary between Adams and Richland.

Adams appeals from the trial court's order, raising the following primary issues: (1) whether the Board erred in "discounting" the 2005 Brown survey; (2) whether the Board erred in concluding that substantial evidence

8

supported its determination that the individual property owner/plaintiffs were entitled to prevail on an estoppel theory; (3) whether the Board erred in failing to consider whether the boundary line as reflected in the S.E. Dickey survey, which the trial court adopted through court order in 1931, has a binding effect upon the Board's determination of the boundary in this matter; and (4) whether the Board erred in relying upon the Cambria County tax assessment/GIS map to establish a boundary line. Subsumed in Adams' issues is the claim that the Board erred in accepting the tax assessment map boundary as the original boundary, and we begin with that issue.

> Section 303 of the Code provides as follows:
>
> Upon application by petition, the court shall appoint three impartial citizens as commissioners . . . to inquire into the request of the petition. After giving notice to parties interested as directed by the court, the commissioners shall hold a hearing and view the lines or boundaries, and they shall make a plot or draft of the lines and boundaries proposed to be ascertained and established if they cannot be fully designated by natural lines and boundaries. The commissioners shall make a report to the court, together with their recommendations. Upon the filing of the report, it shall be confirmed nisi, and the court may require notice to be given by the petitioners to the parties interested.

53 P.S. § 65303. This provision dictates the bounds of the Board's duty—to make a plot or draft of the lines sought to be ascertained. The line sought to be ascertained is the original boundary line created as between the two municipalities. As we have noted already, a board of commissioners' duty under Section 303 of the Code is not to determine a *fair* boundary, but rather to ascertain or recreate *the original boundary* at the inception of one or two municipalities. In this case, the Board reasoned that it could not identify the original boundary based upon the

9

evidence of record, and, instead, opted to use the boundary line depicted on the Cambria County tax assessment map. Unfortunately, there is no evidentiary support for the Board's determination, which, contrary to its statutory task, appears to be founded solely on principles of fairness. Indeed, the experts for both Adams and Richland agree on two points—*i.e.,* that the original boundary line is a straight line and that the Cambria County tax assessment map (which is not a straight line) does not reflect the original boundary line between the two townships. Because there is no factual basis in the record to support the Board's adoption of the tax assessment map as the original boundary line, we must conclude that the Board erred.

Additionally, the Board's reliance upon equitable principles of estoppel or acquiescence is misplaced. Our case law suggests that a board of commissioners may, in certain circumstances, consider such equitable principles, but only after complying with its duty to determine an original boundary line. For example, in *Laflin Borough v. Jenkins Township*, 422 A.2d 1186 (Pa. Cmwlth. 1980), this Court addressed a boundary challenge resolved by a board of commissioners. In that matter, the board considered whether a particular tract of land was in Jenkins Township rather than Laflin Borough or Yatesville Borough. The key problem in that case involved inconsistencies in Laflin's charter describing the boundaries. The board in that matter ultimately determined, based upon its construction of the charter, that the boundary should be the line defined by the charter's metes and bounds description. We affirmed the board's resolution and rejected Yatesville Borough's claim that the doctrine of equitable estoppel should preclude *application* of the original boundary as determined by the board. We concluded that there was no evidence indicating that Yatesville had made

10

substantial *improvements*, as compared to *services* over a period of time, to properties previously believed to be in Yatesville Borough.

Similarly, in *Moon Township*, we considered two questions. The first was whether the board of commissioners correctly concluded that the location of a municipal boundary initially defined by the center of a stream continued to be the actual boundary after the stream had been moved in the 1950s to build a highway. We first affirmed the legal analysis the board applied to determine where the boundary originally existed (adopting the initial location of the stream as the true boundary). Next, we considered whether Moon Township was estopped from claiming (for municipal purposes) the property affected. We concluded that Findlay Township failed to offer sufficient evidence that it had made substantial improvements based upon acquiescence on the part of Moon Township.

The same reasoning applied in *In re Viola*, 838 A.2d 21 (Pa. Cmwlth. 2003), where the Violas owned property near the boundary between (a different) Adams Township and Cranberry Township located in Butler County. The Violas wanted to develop the property (as does Watkins Glen Properties in this case), and had difficulty doing so because the two townships disputed the boundary line. The board of commissioners in that case ultimately concluded that reference to older deeds in the chain of title might illuminate the issue. After directing the parties to conduct additional research and discovering additional deed information on its own, the board of commissioners determined that the original boundary line could be determined based upon the new evidence. On appeal, this Court rejected Cranberry Township's estoppel claim, seeking to have the Butler County tax assessment map boundary lines declared the official boundary line, noting that

Cranberry had not established that any improvements had been made to the Violas' property.

In this matter, we note that the municipalities agree on two facets of the true boundary line—that it is a straight line and that the Cambria County tax assessment line does not reflect the original boundary line between Adams and Richland. There exists the possibility that additional evidence could clarify and make more meaningful the evidence already in the record. Although the Board indicated that it did not find Mr. Brown's testimony competent, because it believed that the evidence was the result of conjecture and speculation, we note that some of the evidence, from both Mr. Brown and Mr. Kalina, could also be interpreted to be circumstantial evidence of a boundary line. Furthermore, Mr. Kalina indicated in his testimony that he did not have sufficient time to investigate deeds going back earlier in time that might confirm his opinion. While it would appear to constitute a herculean task to investigate every conceivable property deed going back as far as such records permit, as was accomplished for the Violas' property, it is possible that, given the townships' agreement that the line is straight, historical deeds of some properties in key locations *might* provide more definite clues to properties along the true original boundary line and render evidence the Board initially characterized as speculative to be circumstantial evidence of a particular boundary.

As suggested above, we believe that the time and place for a board of commissioners to consider evidence that might implicate the equitable estoppel doctrine or acquiescence doctrine is only *after* a board of commissioners determines an original boundary line. Thus, in this case, even if such evidence is eventually pertinent to a final recommendation by the board of commissioners, the Board erred by considering such evidence when it did. Moreover, we disagree

with the Board's conclusions regarding the evidence of acquiescence in this case. Robert Burnworth, who testified that he made $40,000 in improvements to his property, was the only individual property owner who testified that he made significant improvements to his property based upon his understanding of a township boundary line. No other individuals (currently having an interest in property that might be affected by a shift in the boundary line) specifically testified that he or she made improvements to their property based on a boundary line assumption.

Based upon the foregoing, we will remand the matter to the trial court, which we direct to take such action as is necessary to determine the actual boundary line between Adams and Richland, in accordance with this opinion. Once the trial court (or the Board on remand) determines the original boundary line, the Board or the trial court should provide any interested parties with an opportunity to respond to the boundary line determination.

Accordingly, the order of the trial court is vacated, and the matter is remanded to the trial court for further proceedings.


_____
P. KEVIN BROBSON, Judge

13

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Adams Township, | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 2023 C.D. 2014 |
| | : | |
| Richland Township; Cambria County; | : | |
| Watkins Glen Properties, Inc.; | : | |
| Clarann Hillenbrand, Dorian Frazier | : | |
| and JoAnne Frazier; Debra Kuhne; | : | |
| Thomas Costa and Pamela Costa; | : | |
| David Anderson and Jean Anderson; | : | |
| Robert Burnworth and Mary Burnworth; | : | |
| Roy Lowry and Debra Lowry; Virginia | : | |
| Chapman; Berwind Corporation; | : | |
| Paul Singer; Vincent Maxwell and | : | |
| Jessica Maxwell; and Nancy Leone | : | |

# **O R D E R**


AND NOW, this 18th day of December, 2015, the order of the Court of Common Pleas of Cambria County (trial court) is VACATED, and the matter is REMANDED to the trial court for further proceedings consistent with the accompanying opinion.

Jurisdiction relinquished.


---
P. KEVIN BROBSON, Judge