IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| ADAMS TOWNSHIP | : | No. 12 WAP 2016 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court entered |
| | : | December 18, 2015 at No. 2023 CD |
| | : | 2014, vacating the Order of the Court of |
| RICHLAND TOWNSHIP; CAMBRIA | : | Common Pleas of Cambria County |
| COUNTY; WATKINS GLEN | : | entered October 13, 2014 at No. 1223- |
| PROPERTIES, INC.; KIRK A. MOSS AND | : | 2013, and remanding. |
| TINA L. MOSS, DORIAN FRAZIER AND | : | |
| JOANNE FRAZIER; DEBRA KUHNE; | : | ARGUED: November 1, 2016 |
| THOMAS COSTA AND PAMELA COSTA; | : | |
| BRIAN E. MAHL, JR. AND SIERRA L. | : | |
| SHALLER-MAHL, ROBERT | : | |
| BURNWORTH AND MARY | : | |
| BURNWORTH; ROY LOWRY AND | : | |
| DEBRA LOWRY; VIRGINIA CHAPMAN; | : | |
| BERWIND CORPORATION; PAUL | : | |
| SINGER; VINCENT MAXWELL AND | : | |
| JESSICA MAXWELL; AND NANCY | : | |
| LEONE | : | |
| | : | |
| | : | |
| APPEAL OF: RICHLAND TOWNSHIP | | |

**OPINION**

**JUSTICE WECHT**                                              **DECIDED: FEBRUARY 22, 2017**

In this case, two townships dispute the location of their common boundary. Pursuant to the Second Class Township Code,[1] the trial court appointed three commissioners to ascertain that boundary. We granted allowance of appeal to consider

---

[1] See *infra* n.3 and accompanying text.

whether such commissioners, when tasked with determining the location of a municipal boundary but concluding that they cannot do so with certainty, may consider the townships' acquiescence to a line used as the boundary and relied upon by residents, and accordingly recommend the adoption of that alternative line as the municipal boundary. We conclude that, in such a narrow circumstance, the commissioners may rely upon the equitable doctrine of acquiescence in making their determination, and need not search indefinitely for evidence of the original boundary. Accordingly, we reverse the order of the Commonwealth Court and remand for reinstatement of the trial court's order.

## I.    Background

Adams Township ("Adams") and Richland Township ("Richland"), both located in Cambria County, dispute the location of their shared boundary. Adams was carved out of Richland in 1870. Although the document that established Adams presumably would have described the boundary between the townships, that document has been lost. The document is missing from the Cambria County Courthouse and appears in no other repository of historical documents or official records. No copies of the document are known to exist. The townships and their residents long used a line depicted in the Cambria County tax assessment map as the common boundary.

In 2004, the townships were putative defendants in litigation arising from an automobile accident, and they disputed their liability based upon the location of the accident. With the location of the true boundary thus in question, the townships jointly hired a professional surveyor, Frederick Brown, to identify and plot the boundary.[2]

---

[2]    For a map of the area and an illustration of the proposed boundary lines, see Appendix, Board Exhibit 18. The tax assessment line and Brown's proposed boundary are labeled accordingly. The remaining line is the boundary proposed by Richland's expert, discussed *infra*.

Brown relied, in part, upon a survey of nearby municipalities that was performed around 1930. That survey was not conducted to ascertain the boundary between Adams and Richland, but purportedly depicted the northernmost point where the townships meet. Brown further considered a number of "monuments" that aided in his location of that northernmost point along the boundary. Brown believed that a monument to the south of that point established a line, and that, because the original boundary was a straight line, such a line could be extended to determine the location of the southernmost point where the townships meet. Thus, Brown opined, that line was the original boundary between Adams and Richland. As further support, Brown pointed to differentiations in macadam on two roads near his proposed line.

In 2006, Watkins Glen Properties, Inc. ("Watkins Glen"), was planning to develop a subdivision on a plot of land that ostensibly was situated in both Adams and Richland, and it sought clarification from the townships as to the location of the municipal boundary. Richland advised Watkins Glen to follow the tax assessment line, but Adams advised the developer to follow the line established in Brown's survey. The matter remained unresolved for seven years before Watkins Glen requested that the townships resolve their disagreement over the location of the boundary. Accordingly, on April 17, 2013, Adams filed an action for a declaratory judgment, seeking a judicial declaration that Brown's proposed line represents the true boundary between Adams and Richland. The trial court, in turn, appointed a board of commissioners ("Board") pursuant to Section 303[3] of the Second Class Township Code, 53 P.S. §§ 65101, *et seq.*, to determine the location of the boundary.

_____

[3]     Section 303 of the Second Class Township Code provides:

Upon application by petition, the court shall appoint three impartial citizens as commissioners, one of whom shall be a registered surveyor or engineer, to inquire into the request of the petition. After giving notice to
(continued…)

The Board held hearings on November 15, 2013, December 20, 2013, and April 4, 2014. In support of its position, Adams presented the testimony of Frederick Brown, who explained the reasoning behind his survey. Richland offered the testimony of another professional surveyor, David Kalina. Kalina did not conduct his own survey, but he testified that he researched historical documents dating back to 1872. Kalina agreed with Brown that the original boundary was a straight line, but his research led him to conclude that the northernmost point where Adams and Richland meet is a point northeast of the location that Brown identified. Kalina opined that the original boundary could be discerned by extending a line from that point southward to a farm that he identified as the original southern point of convergence between the townships. Kalina believed that the older records that he consulted were more reliable than the documents upon which Brown relied, because they were created closer in time to the establishment of the original boundary.

Relative to the previously-accepted[4] tax assessment line, the differing boundary lines that Brown and Kalina suggested would have varying impacts upon property

---

(…continued)
> parties interested as directed by the court, the commissioners shall hold a hearing and view the lines or boundaries; and they shall make a plot or draft of the lines and boundaries proposed to be ascertained and established if they cannot be fully designated by natural lines or boundaries. The commissioners shall make a report to the court, together with their recommendations. Upon the filing of the report, it shall be confirmed *nisi*, and the court may require notice to be given by the petitioners to the parties interested.

53 P.S. § 65303.

[4]      Although perhaps suggestive of its ultimate conclusion, throughout its report, the Board referred to the tax assessment line as the "current" or "currently existing" boundary line, or described it as the boundary's "current location." See "Board of Commission's Report," 6/16/2014, at 7 ¶¶ 8-12; 8 ¶¶ 22-23; 9 ¶¶ 28-29, 32; 16-17.

owners in the area. Brown's proposed boundary would move at least six individuals' properties, including a substantial portion of Watkins Glen's proposed subdivision, from Richland into Adams, and would move several properties from Adams into Richland. Kalina's proposed boundary, lying well to the east of Brown's and the tax assessment line, would move hundreds of properties from Adams into Richland.

The Board also heard testimony from numerous residents of the disputed area. In general, the residents expressed a desire to maintain the *status quo* of using the tax assessment line as the municipal boundary because they had come to rely upon it in making decisions regarding their properties. All residents who testified indicated that they wished for their properties to remain situated according to their understanding of the township boundary, or explained that they would not have purchased property in the other township originally.[5] Under questioning, some residents stated that they would not object to an alternative boundary, provided that it would not move their properties into the other township.[6] Some residents explained that differing tax rates or property values influenced their decisions regarding where to purchase property.[7] Numerous residents highlighted the importance of sending their children to their preferred school district.[8]

---

[5] See Notes of Testimony, Hearing ("N.T."), 11/15/2013, at 88, 132, 138-39, 158; N.T., 4/4/2014, at 18, 99, 101, 103-04.

[6] See N.T., 4/4/2014, at 22, 99, 101, 103-04.

[7] See N.T., 11/15/2013, at 132, 138; N.T., 4/4/2014, at 91.

[8] See N.T., 11/15/2013, at 91, 132, 139, 154; N.T., 4/4/2014, at 18, 99, 101. This testimony indicated that, as demarcated by the tax assessment line, children residing in Adams attend school in the Forest Hills School District, and children residing in Richland attend school in the Richland School District.

Of significance to the Board's subsequent legal determination, three residents testified that they built houses upon their properties (or made substantial renovations) based upon their understandings of the municipal boundary.[9]  Specifically, Debra Kuhne testified that she purchased property in 1985, relying upon surveys, county maps, and tax assessment records that indicated that the property lay in Richland.  N.T., 11/15/2013, at 87.  She constructed a house on the property in 1986.  Id. at 92.  If Brown's proposed line was adopted as the boundary, her property would be reassessed into Adams.  Id. at 88-89.  Robert Burnworth testified that he purchased property which he understood to lie in Richland, and that he would not have purchased it if it lay in Adams.  Id. at 138.  Brown's proposed line also would place Mr. Burnworth's home in Adams.  Id.  In the two years preceding the hearing, Mr. Burnworth had spent over $40,000 renovating his home, and would not have done so if he knew that his property would lie in Adams.  Id.  Edward Englehart testified that he and his in-laws purchased a tract of undeveloped land approximately forty years before the instant litigation, and they divided the property with the understanding that his parcel would lie in Adams and his in-laws' parcel would lie in Richland.  N.T., 4/4/2014, at 90-92.  Both Mr. Englehart and his in-laws constructed houses on their respective parcels.  Id. at 92.  Mr. Englehart obtained a building permit from Adams, and his in-laws obtained a building permit from Richland.  Id. at 94.  Although Mr. Englehart no longer owns the property, the adoption of Brown's proposed line would move his in-laws' property from Richland into Adams.  Id. at 93-94.

After considering all of the evidence presented, the Board determined that "[t]here is insufficient evidence in the record to permit the Board to determine where the

_____

[9]      See N.T., 11/15/2013, at 88, 92, 138; N.T., 4/4/2014, at 92.

original 1870 boundary line was established." "Board of Commission's Report," 6/16/2014, at 9. The Board rejected the expert opinions of both Brown and Kalina. Although noting that Brown's proposed boundary reflected "the most reasonable analysis and alternative to the [tax assessment line]," the Board concluded that it was "unable to find sufficient supporting evidence in the record, when weighing all factors, including, but not limited to [the] credibility of all witnesses, to support any Board determination" that Brown's proposed line was the true boundary. Id. at 8. However, the Board found that Kalina's opinion was based upon speculation and conjecture, and reflected "self-serving interpretations of select documents" and a disregard for contradicting documents and records. Id. at 9. Further, the Board noted that "[t]here are official governmental records that refute each expert's opinion of the location of the boundary line." Id. Thus, the Board concluded that it was unable to determine the true location of the boundary.

Critically, the Board found that "there were substantial improvements by the property owners affected by the dispute, which were reasonably induced by the [townships'] long acquiescence [to] the current boundary line, which is based upon the tax assessment maps." Id. Because the true location of the boundary could not be ascertained from the evidence presented, and because property owners had substantially improved their properties in justifiable reliance upon the tax assessment line and the townships' acquiescence to that line, the Board recommended the adoption of the tax assessment line as the boundary between Adams and Richland. The Board recognized that the tax assessment line was not the original 1870 boundary. Nevertheless, it concluded that "no testimony revealed a superior methodology," and, "despite the inherent inaccuracies in county tax assessment records," the adoption of the tax assessment line was "tenable, reasonable, and justifiable." Id. at 16. The Board

reasoned that "[a]ny other determination would be based upon speculation and conjecture." Id.

Adams filed exceptions to the Board's report, which the trial court rejected. The trial court confirmed the Board's report and, after obtaining a metes and bounds description of the tax assessment line, entered a final order establishing that line as the boundary between Adams and Richland. Adams appealed the trial court's order to the Commonwealth Court.

Finding that the Board exceeded the scope of its statutory duty, the Commonwealth Court vacated the trial court's order and remanded, directing the trial court to take whatever action it deemed necessary to determine the location of the original boundary between Adams and Richland. Adams Twp. v. Richland Twp., 129 A.3d 1264, 1271-72 (Pa. Cmwlth. 2015). The Commonwealth Court's central premise was that "a board of commissioners' duty under Section 303 of the [Second Class Township] Code is not to determine a *fair* boundary, but rather to ascertain or recreate *the original boundary* at the inception of one or two municipalities." Id. at 1269-70 (emphasis in original). The court characterized the Board's conclusion as recommending the "adoption of the tax assessment map as the original boundary line," rather than an alternative to the original boundary. Id. at 1270. However, because the tax assessment line undisputedly was not the original boundary between Adams and Richland, the Commonwealth Court concluded that the Board necessarily erred.

Turning to the doctrine of acquiescence upon which the Board based its determination, the Commonwealth Court acknowledged that it previously addressed the doctrine in Laflin Borough v. Jenkins Township, 422 A.2d 1186 (Pa. Cmwlth. 1980) ("Laflin II"); Moon Township v. Findlay Township, 553 A.2d 500 (Pa. Cmwlth. 1989); and In re Viola, 838 A.2d 21 (Pa. Cmwlth. 2003). From this trio of cases, the

Commonwealth Court distilled the principle that "a board of commissioners may, in certain circumstances, consider . . . equitable principles, but only after complying with its duty to determine an original boundary line." Adams, 129 A.3d at 1270. The court reasoned that, because the Board failed to establish the location of the original boundary, its consideration of the townships' acquiescence to an alternative line was premature. Accordingly, even if evidence of acquiescence ultimately would influence the Board's recommendation, the Commonwealth Court concluded that "the Board erred by considering such evidence when it did." Id. at 1271.

Apart from the timing or sequence of considerations vital to the Board's reasoning, the Commonwealth Court also rejected the Board's conclusion regarding the particular evidence of the property owners' substantial improvements. Specifically, the court identified the testimony of only one individual, Robert Burnworth, who described renovations to his home and who continued to possess an interest in property potentially affected by the dispute.

Continuing to stress the importance of locating the original boundary, the Commonwealth Court suggested a process by which the trial court or the Board might comply with its order on remand. Essentially, the Commonwealth Court called for further fact-finding in the form of an indefinite number of title searches. The court acknowledged that it "would appear to constitute a herculean task to investigate every conceivable property deed" that might inform the determination. Id. Nevertheless, given the consensus of the townships' experts that the original boundary was a straight line, the court suggested that "historical deeds of some properties in key locations *might* provide more definite clues to properties along the true original boundary line and render evidence the Board initially characterized as speculative to be circumstantial evidence of a particular boundary." Id. (emphasis in original). Accordingly, the

Commonwealth Court vacated the trial court's order and remanded the case for the trial court to "take such action as is necessary to determine the actual boundary line between Adams and Richland." Id.

## II.    Analysis

We granted Richland's petition for allowance of appeal to consider whether the doctrine of acquiescence permitted the adoption of the tax assessment line as the boundary between Adams and Richland, despite the fact that the tax assessment line undisputedly is not the original 1870 boundary.[10] This Court never has addressed the application of acquiescence principles to a municipal boundary dispute. As noted, however, the Commonwealth Court has considered the doctrine in several cases, and, although not binding upon this Court, its prior analyses are instructive.

Richland argues that the Board's determination reflected a practical resolution of the otherwise-insoluble problem arising from the lack of reliable evidence of the true boundary. Brief for Richland at 17. Contrary to the Commonwealth Court's

---

[10]    Adopting Richland's formulation of the issues verbatim, our order granted review of the following issues:

> 1. Was it proper for the board of commissioners to consider the boundary as shown in the tax assessment records not as evidence of the location of the original line but as a practical alternative in order to resolve the continuing uncertainty as to the location of the boundary?
>
> 2. Was it proper for the board of commissioners—when faced with the inability to determine the original boundary—to consider the acquiescence of the municipalities to the boundary as reflected in the tax maps, the reliance by the landowners in the affected area on that tax map boundary, and the inducement of such reliance by the municipalities in order to resolve the continuing uncertainty as to the location of the original boundary?

Adams Twp. v. Richland Twp., 136 A.3d 976, 976-77 (Pa. 2016) (*per curiam*). Because of their substantial interrelationship, we consider these issues together.

characterization, Richland notes that the Board never considered the tax assessment line to be the original boundary. Id. at 18-19. Instead, Richland asserts that the Board correctly recommended its adoption as an alternative boundary because the true boundary could not be ascertained and because the doctrine of acquiescence supported such a recommendation. Richland argues that the Commonwealth Court's decisions in Laflin II, Moon, and Viola demonstrate the viability of the doctrine, and that the Board correctly interpreted and applied those precedents. Richland argues that those cases do not support the Commonwealth Court's holding that the original boundary must be established prior to consideration of acquiescence principles. Id. at 24.

Richland highlights the testimony of property owners, Debra Kuhne, Robert Burnworth, and Edward Englehart, who detailed the substantial improvements to their properties made in reliance upon the "historically recognized division line" between Adams and Richland, which the Board concluded established a sufficient basis to apply the doctrine of acquiescence. Id. at 28. Richland disputes the Commonwealth Court's conclusion that only Robert Burnworth's testimony constituted competent evidence of substantial improvements, and argues that the Board correctly considered the testimony of all three property owners. Finally, Richland asserts that compliance with the Commonwealth Court's order on remand will be unduly onerous and will extend the period of uncertainty that has been disruptive to the community.

Adams argues that the Board was required by statute to establish the location of the original boundary, and that its recommendation reflected an erroneous effort to alter the municipal boundary "so as to suit the convenience of the inhabitants," which, although once a viable statutory basis for boundary alteration, no longer is authorized by Section 302 of the Second Class Township Code. Brief for Adams at 6-8. Adams

asserts that there was no need to select a "practical alternative" boundary because "overwhelming evidence" supported the adoption of Brown's proposed line as the original boundary. Id. at 10.

Adams agrees with the Commonwealth Court's conclusion that the Board should not have considered the doctrine of acquiescence prior to establishing the location of the original boundary. Id. at 16-17. Furthermore, Adams asserts that the Board erred in concluding that the property owners' testimony constituted sufficient evidence of substantial improvements to support the doctrine's application. Although Adams concedes that Robert Burnworth's testimony was competent evidence because he spent over $40,000.00 in improvements, Adams notes that Edward Englehart "made no reference to costs," and Debra Kuhne offered "[n]o evidence of substantial property improvements." Id. at 16. Thus, Adams argues that the Board's determination was not supported by competent evidence.

A. Standard of Review

The Commonwealth Court has held that, because resolution of a municipal boundary dispute requires commissioners to determine the legally correct boundary, those commissioners are not restricted to considering only the lines proposed by an interested party, and there is no burden of proof to be allocated. See Moon, 553 A.2d at 503-04. When a trial court appoints a board of commissioners to determine the location of a municipal boundary, the board serves as the fact-finder and possesses the exclusive prerogative to determine the weight of the evidence presented. See Viola, 838 A.2d at 27 (citing Robinson Twp. v. Collier Twp., 303 A.2d 575 (Pa. Cmwlth. 1973)). The board's determination "has the force and effect of a jury verdict and, therefore, when there is legally competent testimony to support the order, it will not be disturbed by a reviewing court." Robinson Twp., 303 A.2d at 577. Section 303 of the Second

Class Township Code directs that, when a board files its report and recommendation with the appointing court, "it shall be confirmed *nisi*."[11] 53 P.S. § 65303. A reviewing court may not disturb the board's determination unless the board committed an error of law or its conclusion was not supported by competent evidence. See Moon, 553 A.2d at 504; Viola, 838 A.2d at 26.

B. Article IX, Section 8 of the Pennsylvania Constitution and Boundary Disputes

Before discussing the relevant Commonwealth Court precedent on the doctrine of acquiescence, we find it helpful to review the constitutional and statutory background that underlies the legal issues surrounding municipal boundaries in this commonwealth, particularly in light of Adams' argument that the Board exceeded the scope of its statutory authority.

In 1968, the Pennsylvania Constitution was amended to include Article IX, Section 8, which concerns the consolidation, merger, and change of municipal boundaries. That section provides:

> **Uniform Legislation.—**The General Assembly shall, within two years following the adoption of this article, enact uniform legislation establishing the procedure for consolidation, merger or change of the boundaries of municipalities.
>
> **Initiative.—**The electors of any municipality shall have the right, by initiative and referendum, to consolidate, merge and change boundaries by a majority vote of those voting thereon in each municipality, without the approval of any governing body.
>
> **Study.—**The General Assembly shall designate an agency of the Commonwealth to study consolidation, merger and boundary changes, advise municipalities on all problems which might be connected therewith, and initiate local referendum.

---

[11] The Latin word for "unless," *nisi* means "([o]f a court's *ex parte* ruling or grant of relief) having validity unless the adversely affected party appears and shows cause why it should be withdrawn." Black's Law Dictionary 1207 (10th ed. 2014).

**Legislative Power.**—Nothing herein shall prohibit or prevent the General Assembly from providing additional methods for consolidation, merger or change of boundaries.

Pa. Const. art. IX, § 8. Although this provision imposed a mandate upon the General Assembly to enact uniform legislation regarding, *inter alia*, changes of municipal boundaries, the General Assembly failed to enact the required legislation within the constitutionally-mandated two-year time period.[12] However, Article IX, Section 8 specifies that, regardless of the contemplated statutory procedures, boundary changes may be effectuated "by initiative and referendum" and "a majority vote of those voting thereon in each municipality." Id.

Following the expiration of the constitutional deadline, the Commonwealth Court held that "the failure of the legislature to enact such legislation within the constitutionally mandated [two]-year period ending in April 1970 . . . invalidate[d] all preexisting statutory provisions establishing procedures for boundary changes." In re Establishment of Boundary Between Collier Twp. and Robinson Twp., 360 A.2d 841, 842 (Pa. Cmwlth. 1976). In Middle Paxton Township v. Borough of Dauphin, 308 A.2d 208, 211 (Pa. Cmwlth. 1973), the Commonwealth Court deemed invalid the statutory annexation procedures under the Borough Code because Article IX, Section 8 "necessarily abrogat[ed] the preexisting legislation sought to be replaced." Accordingly, by failing to act within the two years specified, the General Assembly "thereby caused

---

[12] In 1994, the General Assembly enacted the Municipal Consolidation or Merger Act, Act of October 13, 1994, P.L. 596, No. 90, 53 Pa.C.S. §§ 731-41. Although enacted over twenty years beyond the constitutional deadline, this legislation partially complied with Article IX, Section 8 by establishing procedures for consolidation and merger of municipalities. However, the statutory scheme does not provide for *changes* to boundaries between municipalities that are not undergoing consolidation or merger, and therefore offers no guidance in the instant case.

the initiative and referendum to be the sole remaining procedure for changing boundaries." Id. This Court affirmed Middle Paxton Township in Derry Township Supervisors v. Borough of Hummelstown, 326 A.2d 342 (Pa. 1974), and agreed with the Commonwealth Court's calculation of the constitutional deadline and the consequences of the General Assembly's failure to meet it.

Section 302 of the Second Class Township Code previously provided that "[t]he courts of quarter sessions may, upon the presentation of a petition . . . alter the lines of a township and any adjoining township, borough, or city so as to suit the convenience of the inhabitants thereof." 53 P.S. § 65302 (amended, Act of Nov. 9, 1995, P.L. 350, No. 60, 53 P.S. §§ 65101, *et seq.*). In Collier Township, the Commonwealth Court held that the nearly identical provision of the First Class Township Code, which similarly authorized the alteration of municipal boundaries "so as to suit the convenience of the inhabitants thereof," 53 P.S. § 55302, was invalidated by the General Assembly's failure to comply with the mandate of Article IX, Section 8. See Collier Twp., 360 A.2d at 842. That language subsequently was removed from Section 302 of the Second Class Township Code, which now provides, in relevant part:

(a) The courts of common pleas may upon the presentation of a petition:

(1) require the lines or boundaries of townships to be ascertained; and

(2) ascertain disputed lines and boundaries between two or more townships or between townships and any municipal corporation.

53 P.S. § 65302(a).[13]

---

[13] Despite the Commonwealth Court's holding in Collier Township, and despite the 1995 amendments to the Second Class Township Code, the language permitting alteration of municipal boundaries "so as to suit the convenience of the inhabitants thereof" never was removed from the First Class Township Code. See 53 P.S. § 55302.

The General Assembly has enacted a statutory scheme establishing procedures for the consolidation and merger of municipalities. See 53 Pa.C.S. §§ 731-41.[14] However, that legislation provides no procedure for the alteration of boundaries between municipalities that do not petition to consolidate or merge, but seek only to relocate a shared boundary. Accordingly, pursuant to Article IX, Section 8, and in the absence of a legislative enactment to the contrary, such boundary changes must be accomplished through initiative and referendum. This conclusion, however, is not dispositive of the question at issue in the instant case, which concerns not a boundary *change*, but a boundary *dispute*. That distinction was the basis of the Commonwealth Court's decision in Laflin Borough v. Yatesville Borough, 404 A.2d 717 (Pa. Cmwlth. 1979) ("Laflin I").

The dispute in Laflin I arose from an inconsistency in Laflin Borough's charter. Although that document provided a metes and bounds description of Laflin's boundary lines, identified specific lots, and specified the total acreage of the borough, it also stated that Laflin's northeastern boundary adjoined the southwestern boundary of Yatesville Borough. See Laflin II, 422 A.2d at 1187. If the two boroughs shared that boundary, however, the remainder of the description in Laflin's charter would be rendered inaccurate. Id. Laflin filed a petition seeking a judicial determination of the correct boundary, and the trial court appointed a board of commissioners pursuant to Section 503 of the Borough Code, 53 P.S. § 45503 (repealed and recodified at 8 Pa.C.S. § 503). After the trial court confirmed the board's report, Yatesville objected to the trial court's jurisdiction to entertain such a boundary dispute in light of Article IX, Section 8. Relying, *inter alia*, upon Middle Paxton Township and Collier Township, the

---

14     See *supra* n.12.

trial court concluded that the statute which authorized the court to ascertain, establish, or alter disputed boundaries was invalid, and it sustained Yatesville's objection to the court's jurisdiction.

On appeal, the Commonwealth Court noted that the issue involved a boundary *dispute*, because the "true boundary line between Laflin and Yatesville is unknown and uncertain." Laflin I, 404 A.2d at 718. After reviewing its prior interpretations of Article IX, Section 8 and the consequences of the General Assembly's inaction, the Commonwealth Court concluded that the applicable statute, as it related to the ascertainment and establishment of disputed boundaries, remained valid. The court explained:

> We so hold because the procedure for resolving boundary lines [*sic*] disputes is not a procedure for "consolidation, merger or change" of municipal boundaries within the meaning of Article IX, Section 8. If the Constitution were to be interpreted otherwise, then initiative and referendum would be the only procedures available to resolve municipal boundary line disputes. We cannot believe that the drafters of the Constitution intended that the electorate should decide such a factual question in the voting booth. Whether a municipal boundary should be changed is a proper question for the ballot. The electorate, however, cannot be asked to find the line.

Id. at 719. Accordingly, the Commonwealth Court held that the trial court had jurisdiction to adjudicate the boundary dispute, and that such disputes are not to be resolved through the process of initiative and referendum.

The General Assembly has indicated that it approves of the Commonwealth Court's conclusion that judicial boundary alteration to suit the convenience of a municipality's inhabitants is no longer a valid procedure, but the legislature similarly has signaled its approval of the distinction that the court established between boundary changes and boundary disputes in Laflin I, as well as the judiciary's role in resolving the latter. The 2012 comment to Section 502 of the Borough Code provides, in full:

Portions of this section that relate to altering the lines of a borough and any adjoining township, borough or city to suit the convenience of the inhabitants, or causing the lines and boundaries of boroughs to be ascertained and established, are deleted. Portions of a similar section in the First Class Township Code (§ 302) were held invalid by the court in [Collier Township, 360 A.2d at 842] (holding that the portion of section 302 that relates to the alteration of township lines to suit the convenience of the inhabitants is invalid since the only valid procedures for making boundary alterations are by initiative and referendum).

A portion of section 502 remains, however, regarding ascertaining and establishing *disputed* boundaries between a borough and a municipal corporation. See [Laflin I, 404 A.2d at 719] (holding that "Section 502 of The Borough Code, as it relates to ascertainment and establishment of disputed boundary lines, has not been invalidated by the legislature's failure to act within the mandate of Article IX, Section 8 of the Pennsylvania Constitution. . . . Whether a municipal boundary should be changed is a proper question for the ballot. The electorate, however, cannot be asked to find the line.")

8 Pa.C.S. § 502, cmt. (emphasis added).

We agree with the Commonwealth Court's reasoning in Laflin I. Although the alteration of a known municipal boundary must be accomplished through initiative and referendum, the resolution of a dispute over an uncertain boundary is a task for the judiciary. Such a task requires the weighing of testimonial and other evidence, and the rendering of factual findings and legal conclusions. Voters are equipped to choose between maintaining a known boundary and adopting an alternative, but they cannot be asked to undertake the judicial task of resolving a dispute over the location of an uncertain boundary. Furthermore, the jurisdiction of the courts over such disputes is provided by statute. Although the General Assembly could have enacted legislation to supersede the Commonwealth Court's holding in Laflin I or to provide an alternative mechanism for the resolution of such disputes, it instead expressed its approval of the Laflin I holding in the comment to Section 502 of the Borough Code, and, despite other amendments to the Second Class Township Code, preserved the judiciary's

authorization to "ascertain disputed lines and boundaries between two or more townships or between townships and any municipal corporation." 53 P.S. § 65302(a)(2).

Accordingly, we reject Adams' argument that the Board erroneously recommended the alteration of the boundary between Adams and Richland "so as to suit the convenience of the inhabitants." Rather, the Board applied the doctrine of acquiescence as a means to resolve the dispute over the unknown municipal boundary.

C. The Doctrine of Acquiescence

We now turn to the doctrine of acquiescence and the propriety of its application to the circumstances of the instant case. As previously noted, the viability of employing the doctrine of acquiescence to set a municipal boundary raises a novel issue before this Court. Accordingly, we look to the Commonwealth Court's prior analyses of the doctrine.

Following the Commonwealth Court's determination in Laflin I that the trial court possessed jurisdiction to resolve the municipal boundary dispute, the trial court agreed with the board of commissioners' conclusion that the call for a shared boundary between Laflin and Yatesville was premised upon the Laflin incorporators' mistaken assumption about the location of Yatesville's boundary. Like the board of commissioners, the trial court concluded that the disputed territory lay within neither Laflin nor Yatesville, but within a third municipality. The Commonwealth Court agreed with the trial court and affirmed its order. See Laflin II, 422 A.2d at 1190.

Yatesville, however, argued that the land between the boroughs should be designated as part of Yatesville because of the residents' long association with that borough. Yatesville contended that other municipalities should be estopped from claiming the disputed area because the residents paid taxes to Yatesville, because their

children attended school in Yatesville, and because Yatesville provided municipal services to those residents, such as street cleaning, garbage collection, snow removal, and police and fire services. Yatesville relied upon an entry in the American Jurisprudence encyclopedia, which stated that the "erection of improvements by one adjoining owner after entering lands in accordance with an agreement, or acquiescence for a long period of time, as to the location of a boundary line, may estop the other from asserting that such boundary line was not the true line." Id. at 1189 (quoting 12 Am.Jur.2d Boundaries § 83). The Commonwealth Court noted that Yatesville had not presented evidence of the erection of improvements in the disputed area. Instead, Yatesville claimed that estoppel was justified by its provision of municipal services to residents of the area. The Commonwealth Court disagreed, holding that, "[a]bsent substantial improvements, the estoppel doctrine is . . . inapplicable." Id.

Moon concerned a dispute between Moon Township and Findlay Township regarding whether their shared boundary was altered by the relocation of a stream that Findlay's charter designated as the boundary. The property in dispute originally lay in Moon. However, sometime after 1952, a portion of the stream that served as the municipal boundary was relocated to accommodate the construction of a highway. For approximately thirty years, the property was treated as being in Findlay. That is, the municipalities continued to use the stream as the boundary as if the stream had not been relocated. In 1986, the construction of a hotel on the disputed property caused Moon to challenge the continued use of the stream as the boundary. The trial court appointed a board of commissioners, which determined that the boundary between Moon and Findlay remained in its pre-1952 location, and was not altered by the relocation of the stream. The trial court confirmed the board's report, and the Commonwealth Court affirmed. Moon, 553 A.2d at 507.

Findlay argued that Moon should be estopped from claiming the disputed property because Moon acquiesced to the post-1952 location of the stream as the boundary for over thirty years. Findlay noted that it provided police and fire services to the hotel on the disputed property, that all taxes on the property had been paid to Findlay, that the roads by which the hotel was accessed ran through Findlay, and that the hotel received water services from the Findlay Township Water Authority. In rejecting Findlay's argument, the Commonwealth Court discussed the applicability of the doctrine of acquiescence to municipal boundary disputes. The court reviewed the effect of Article IX, Section 8 and the line of cases which held that preexisting statutory procedures for altering boundaries were invalid. However, in accordance with the holding in Laflin I, the court noted that statutory provisions that concern judicial resolution of boundary disputes remained valid. The court noted that it had considered the doctrine of acquiescence "within the context of a true boundary dispute" in Laflin II. Id. at 505. Based upon Laflin II and the Article IX, Section 8 cases, the Commonwealth Court concluded that Pennsylvania courts "[do] not recognize the doctrine of acquiescence when to do so would alter known municipal boundary lines but will, in true boundary disputes, consider an estoppel argument based on a municipality's long acquiescence to a conceivably true boundary location." Id.

The court rejected Findlay's purported evidence of acquiescence, noting that it relied primarily upon the provision of municipal services, which Laflin II held to be insufficient to sustain an estoppel in a municipal boundary dispute. The argument could prevail only upon a showing of substantial improvements, and Findlay failed to establish that any improvements were made to the property prior to the initiation of the hotel project. Although the hotel project involved improvements to the property, Moon had not acquiesced to those improvements. Rather, the hotel project caused Moon to

question the location of the boundary and to initiate the litigation. The Commonwealth Court concluded that, "[i]n order for acquiescence to work an estoppel in a municipal boundary dispute, there must be more than substantial improvements to the property affected by the dispute. The improvements must have been reasonably induced by the long acquiescence." Id. at 507.

The Commonwealth Court again addressed an estoppel argument based upon the acquiescence doctrine in Viola. The Violas owned a ninety-acre property in Butler County near the boundary between Adams Township and Cranberry Township. They sought to develop the property, but encountered difficulty in dealing with the townships because the townships disputed jurisdiction over the subject property. The Violas filed a petition for the appointment of a board of commissioners to determine the location where the municipal boundary crossed their property. All direct evidence of the location of the original boundary had been lost or destroyed. Notably, Cranberry's expert suggested using the line depicted in the county tax map as the boundary, but the board rejected that approach because it would establish a new boundary. After determining that the record was insufficient to allow it to determine the location of the true boundary, the board directed the parties to produce all deeds in the chain of title for the subject property going back to 1850. Eventually, the board corroborated evidence in the record and established the true location of the boundary. The trial court confirmed the board's recommendation, and the Commonwealth Court affirmed. Viola, 838 A.2d at 30.

On appeal, Cranberry argued that the doctrine of acquiescence mandated that the boundary be located in accordance with the county tax maps. In support, Cranberry relied upon Moon. The Commonwealth Court discussed Moon and its holding that the doctrine of acquiescence may apply where there have been substantial improvements induced by a municipality's long acquiescence to a particular boundary, but the court

concluded that the doctrine did not apply to the subject property because that property "was essentially undeveloped." Id. at 29. Although the board recognized that improvements had been made to other properties to the north and south of the subject property, the Commonwealth Court agreed with the board's determination that the absence of substantial improvements to the property in dispute precluded application of the doctrine of acquiescence. The court rejected Cranberry's argument "without prejudice to the possible application of the doctrine elsewhere." Id.

Adopting the Commonwealth Court's reasoning, particularly its thorough analysis in Moon, we conclude that Pennsylvania law recognizes the doctrine of acquiescence, and we hold that the doctrine may be applied to resolve a municipal boundary dispute when the location of the municipal boundary is uncertain.[15] A board of commissioners'

---

[15] We note that other jurisdictions recognize the doctrine of acquiescence, and that other state courts have applied the doctrine to resolve municipal boundary disputes, particularly where the location of a boundary is uncertain. See, e.g., LaPorto v. Vill. of Philmont, 346 N.E.2d 503, 505 (N.Y. 1976) ("We hold that the doctrine of acquiescence is applicable . . . where, by custom, usage and the passage of time, disputed territory has been assumed by all interested persons to be beyond the boundaries of one entity of local government and within those of another, and where property owners or adjacent units of local government have relied to their detriment upon the inaction and passivity of a municipal corporation to which knowledge of the original boundaries at the time of incorporation may be imputed."); City of Alameda v. City of Oakland, 246 P. 69, 73 (Cal. 1926) ("The issues presented in this case from the standpoint of both the law and the facts were properly the subject of legitimate controversy because of the uncertainty of the location of said boundary line, and were therefore the proper subject of the application of the doctrine of acquiescence."); Starry v. Lake, 28 P.2d 80, 83 (Cal. Ct. App. 1933) ("Long acquiescence in the location of municipal boundaries by the local corporation and the inhabitants thereof, where all municipal action and improvements have been done under the assumption that such are the boundaries, will support the conclusion that they are the true boundaries, notwithstanding they were not originally so located and, hence, indefinite and uncertain."); Thomas v. Parsley, 141 S.W.2d 302, 306 (Ky. 1940) ("[I]t is of great importance to the public that settled conditions, if they be settled by acquiescence, and have existed for a long period of time, thereby fixing personal, civil and political rights be not disturbed, unless the disturbance be thoroughly justified."); see generally McQuillin, The Law of Municipal Corporations § 7:09 (3d ed. rev. 1999). The Supreme Court of the United States also has held that the doctrine applies as between states. See Michigan v. Wisconsin, 270 U.S. 295, 308 (1926) ("The
(continued…)

primary task is to ascertain the true location of the boundary in dispute. As the fact-finder, it is the board's prerogative to weigh the evidence, to make credibility determinations, and to decide whether the evidence is sufficient to support a conclusion that the true boundary lies in a particular place, or whether, instead, the location of a disputed boundary remains uncertain. If the board is able to determine precisely the location of the boundary from the evidence presented, its statutory duty is discharged. However, that duty does not require the board to resort to speculation or conjecture. When a board of commissioners is unable to determine the location of a municipal boundary, it may consider whether the doctrine of acquiescence supports the adoption of a particular boundary line.

In applying the doctrine, the board should consider whether substantial improvements have been made to property in reasonable reliance upon an assumed boundary. Where interested municipalities allow such improvements to be constructed without asserting their jurisdiction over the properties in question, or challenging the jurisdiction of another municipality, or otherwise taking action to ascertain the true location of the boundary, they tacitly have induced such reliance through their acquiescence to the assumed boundary. In such a circumstance, the board may recommend the adoption of the assumed boundary, notwithstanding the fact that the recommended boundary undisputedly is not the original boundary.

We find no support in Laflin II, Moon, or Viola for the Commonwealth Court's conclusion that the Board in the instant case was required to ascertain the location of the original boundary prior to its consideration of the doctrine of acquiescence. Indeed,

_____

(…continued)
rule, long settled and never doubted by this court, is that long acquiescence by one state in the possession of territory by another and in the exercise of sovereignty and dominion over it is conclusive of the latter's title and rightful authority.").

the court's holding in <u>Moon</u> directly contradicts that proposition. If the Board was able to establish conclusively the true location of the boundary, it would therefore be a "known municipal boundary" to which the doctrine of acquiescence is inapplicable, and which may be altered only by the electorate through initiative and referendum. <u>See</u> <u>Moon</u>, 553 A.2d at 505.

We further reject the Commonwealth Court's command that the record be reopened for the submission of "historical deeds of some properties in key locations" that "*might* provide more definite clues" to the location of the original boundary. <u>Adams</u>, 129 A.3d at 1271 (emphasis in original). If a board of commissioners believes that the provision of additional evidence will aid its determination, it may direct the parties to provide such evidence, as the board did in <u>Viola</u>. <u>See</u> 838 A.2d at 24. In <u>Viola</u>, that decision was made by the board as the fact-finder, and the additional evidence that it sought concerned only one property. Here, the Commonwealth Court, an appellate court reviewing a determination that "has the force and effect of a jury verdict," <u>Robinson Twp.</u>, 303 A.2d at 577, instructed that the chain of title be produced for an indefinite number of properties stretching along a substantial portion of a county. This is akin to an appellate court holding that a jury verdict is invalid merely because additional relevant evidence *may* exist. As a reviewing court, the Commonwealth Court may not disturb the board's determination unless the board committed an error of law or its conclusion was not supported by competent evidence. <u>See</u> <u>Moon</u>, 553 A.2d at 504; <u>Viola</u>, 838 A.2d at 26.[16]

---

[16]     By contrast, the Commonwealth Court stated in <u>Robinson Township</u> that, "[i]f the reviewing court is dissatisfied with the report of the commission, it is given the authority to refer the matter back to the same or new commissioners for another report." 303 A.2d at 577. We find that this statement is in tension with the Commonwealth Court's framing of the standard of review in other cases, as well as that court's holding in <u>Robinson Township</u>, itself, that a board of commissioners' determination "has the force (continued…)

By holding that a board of commissioners may consider the doctrine of acquiescence upon its determination that the original boundary cannot be located conclusively, we strike a balance between the board's statutory duty to determine, when possible, the true location of the boundary and the need to bring resolution and closure to disputes involving municipal boundaries. Although ascertainment of the true location of the boundary is the primary means by which such disputes may be resolved, a board of commissioners' search for evidence of that boundary need not extend in perpetuity. Where, as in the instant case, the board conducts extensive hearings and takes a wealth of evidence but still cannot determine the location of the boundary, resort to equitable considerations such as the doctrine of acquiescence may resolve the dispute and bring an end to the uncertainty and concomitant disruption to the community.

Having concluded that the doctrine of acquiescence may apply to the resolution of a dispute concerning an unknown municipal boundary, we turn to the Board's application of the doctrine in the instant case. This case involves a "true boundary dispute," Moon, 553 A.2d at 505, in that the original location of the boundary between Adams and Richland is unknown and uncertain. See Laflin I, 404 A.2d at 718. The Board concluded that "[t]here is insufficient evidence in the record to permit the Board to determine where the original 1870 boundary was established." "Board of Commission's

_____

(…continued)

and effect of a jury verdict." Id. Because mere "dissatisfaction" is an insufficient basis for a reviewing court to disturb a fact-finder's determinations, we disapprove of the above-quoted statement in Robinson Township. We do not foreclose the possibility that, in certain circumstances, a reviewing court may conclude that a remand is appropriate because a board of commissioners put forth an inadequate effort to discharge its statutory duty or because a board's report fails to provide a sufficient basis to conduct appellate review. We do not here decide when such an order would be appropriate because, as the Commonwealth Court noted, and we agree, the Board in the instant case "did a commendable job in seeking to fulfill its obligation." Adams, 129 A.3d at 1266.

Report," 6/16/2014, at 9. In reaching this conclusion, the Board "took all of the surrounding circumstances into consideration and determined which witnesses it believed and what weight was to be given to their testimony." Id. at 15. We reject Adams' argument that the Board should have credited Brown's testimony and adopted his proposed boundary, because such an argument is merely a challenge to the fact-finder's determinations of the weight of the evidence and the credibility of witnesses.

With the original location of the boundary uncertain, the Board was permitted to consider the effect of the doctrine of acquiescence. Although Laflin II, Moon, and Viola recognized the viability of the doctrine, all of those cases held that the doctrine was inapplicable under the circumstances. In Laflin II and Viola, there was a lack of substantial improvements altogether, and in Moon, the relevant improvements were not induced by the municipality's acquiescence. In the instant case, the Board found that "there were substantial improvements by the property owners affected by the dispute, which were reasonably induced by the long acquiescence [to] the current boundary line, which is based upon the tax assessment maps." Id. at 9.

As noted earlier, three property owners that attended the Board's hearings testified regarding the construction of substantial improvements to their properties. The Commonwealth Court found, and Adams concedes, that Robert Burnworth's testimony constituted competent evidence of substantial improvements. However, Adams asserts that the testimony of Edward Englehart and Debra Kuhne was insufficient in this context because Mr. Englehart "made no reference to costs," and Ms. Kuhne presented "[n]o evidence of substantial property improvements." Brief for Adams at 16. We hold that the Board was not required to establish a monetary value in order to find a substantial improvement. Black's Law Dictionary defines "improvement" as "[a]n addition to property, usu[ally] real estate, whether permanent or not; esp[ecially] one that increases

its value or utility or that enhances its appearance." Black's Law Dictionary 875 (10th ed. 2014). A house constructed on a parcel of real estate certainly constitutes a substantial improvement. Both Ms. Kuhne and Mr. Englehart testified that they constructed houses on their properties. N.T., 11/15/2013, at 92; N.T., 4/4/2014, at 92. All three property owners testified that they constructed the improvements on their properties with the understanding that their properties lay in a particular township. N.T., 11/15/2013, at 86, 138; N.T., 4/4/2014, at 91-92. While the adoption of Brown's proposed line would relocate these properties, the use of the tax assessment line as the boundary would maintain the division as each property owner understood it.

The remainder of our inquiry concerns whether the townships induced the property owners' reliance through their acquiescence to the tax assessment line. The evidence adduced before the Board demonstrated that the townships had allowed the boundary to go unchallenged for many years, despite the property owners' construction of improvements in the disputed area. For instance, Ms. Kuhne testified that she constructed her home in 1986. N.T., 11/15/2013, at 92. Mr. Englehart did not mention a specific year, but testified that he and his in-laws purchased their properties and constructed homes approximately forty years before the instant litigation. N.T., 4/4/2014, at 90. The townships did not begin to question the boundary until, at the earliest, the commencement of unrelated personal injury litigation in 2004, and Adams did not formally seek a determination of the location of the boundary, so as to put the public on notice of the dispute, until commencing the instant litigation on April 17, 2013. The townships' passivity for such an extended period is a strong indication of their acquiescence to the assumed boundary.

The townships also took more affirmative actions that suggested their approval of the assumed boundary. For instance, Mr. Englehart testified that, believing his property

to lie in Adams, he went to Adams to obtain a building permit to construct his house. Id. at 94. His in-laws, believing that their property lay in Richland, went to Richland for a building permit. Id. Neither township questioned its jurisdiction over those properties. Furthermore, the townships used the tax assessment line for other purposes, such as determining the district in which children attend school. As the testimony adduced at the hearings indicated, this was a particularly important use of the assumed boundary to numerous residents of the disputed area, and serves as a further indication that the townships induced their residents' reliance upon the tax assessment line.

## III.    Conclusion

For the foregoing reasons, we conclude that the doctrine of acquiescence allowed the adoption of the tax assessment line as the boundary between Adams and Richland. We reject any contention that the Board was required to forestall its consideration of the doctrine until after it established the location of the original boundary. To the contrary, we hold that the Board correctly considered the doctrine upon its determination that it was unable to determine the original location of the boundary. Because the Board's report and recommendation was supported by competent evidence and reflected no error of law, the trial court was correct to confirm it, and that determination shall not be disturbed on appeal.

The order of the Commonwealth Court is reversed, and the case is remanded for further proceedings consistent with this Opinion.

Chief Justice Saylor and Justices Baer, Todd, Donohue, Dougherty and Mundy join the opinion.