# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Woodward Township Municipal :
Corporation of Clinton County, :
Pennsylvania :
                            :
             v.             : No. 704 C.D. 2020
                            : No. 733 C.D. 2020
Dunnstable Township Municipal : ARGUED:  April 15, 2021
Corporation of Clinton County, :
Pennsylvania, :
                Appellant    :


BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge
                  HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**OPINION BY**
**SENIOR JUDGE LEADBETTER**                  **FILED:  May 12, 2021**

This matter involves a boundary line dispute between Woodward Township and Dunnstable Township, both second class townships in Clinton County. Dunnstable Township appeals from the July 27, 2020 corrected order[1] of the Court of Common Pleas of Clinton County[2] confirming the decision of the board of boundary commissioners, which found by a vote of two-to-one in favor of Woodward Township that the boundary line it advocated, referred to as the "Kimberly line," reflected the proper location of the boundary between the two townships.

---

[1] The instant appeal is docketed at Numbers 704 C.D. 2020 and 733 C.D. 2020, which were consolidated. The first appeal was from an initial order entered by the trial court and the second from a corrected order.

[2] The Honorable John B. Leete, Senior Judge of the Court of Common Pleas of Potter County, specially presided.

The dispute arose in the late 2000s when a Woodward Township supervisor noticed that the boundary line depicted on the Clinton County Geographic Information System (GIS) Department's maps did not coincide with tax parcel maps. Eventually, in 2017, Woodward Township filed a petition in the trial court for the appointment of a board of boundary commissioners under Section 302 of the Second Class Township Code.[3] The trial court appointed a board of three commissioners in accordance with the procedure set forth in the Code.[4] The commissioners held a hearing on October 19, 2018, at which the townships presented testimony and submitted evidence. The commissioners also conducted a view of the disputed boundary line on November 7, 2018.

---

[3] Section 302 of the Second Class Township Code, Act of May 1, 1933, P.L. 103, *as reenacted and amended,* 53 P.S. § 65302, provides in pertinent part that upon petition a trial court may "require the lines or boundaries between two or more townships to be ascertained."

[4] Section 303 of the Second Class Township Code provides as follows:

> Upon application by petition, the court shall appoint three impartial citizens as commissioners, one of whom shall be a registered surveyor or engineer, to inquire into the request of the petition. After giving notice to parties interested as directed by the court, the commissioners shall hold a hearing and view the lines or boundaries; and they shall make a plot or draft of the lines and boundaries proposed to be ascertained and established if they cannot be fully designated by natural lines or boundaries. The commissioners shall make a report to the court, together with their recommendations. Upon the filing of the report, it shall be confirmed nisi, and the court may require notice to be given by the petitioners to the parties interested.

53 P.S. § 65303.

The three Commissioners were Rodney A. Beard, an attorney; John Curtin, a real estate professional and appraiser; and Fred Gay, a surveyor.

The facts, as found by the commissioners (Comm'rs' Report at pp. 3-6, Findings of Fact "F.F." Nos. 1-21), may be summarized briefly as follows, with further elaboration as necessary in the discussion below. In 1841, Dunnstable Township was subdivided to create Woodward Township by the court of quarter sessions of Clinton County pursuant to the law then in place. (*Id.*, F.F. No. 3.) The 1841 boundary between the townships ran north-south. (*Id.*, F.F. No. 4.)

In 1843, citizens residing in the southwestern portion of Dunnstable Township requested the court of quarter sessions, again pursuant to the process of the time, to adjust the boundary line between the two townships so that ground located on the southwestern side of Dunnstable Township would be annexed into Woodward Township, effectively moving the southern portion of the boundary line eastward. (*Id.*, F.F. No. 8.) The commissioners found, with some additional detail, that "[b]asically the annexation . . . accomplished a subdivision of a rectangular portion of Dunnstable Township that was 170 perches on its short [east-west] side and 780 perches on its long [north-south] side."[5] (*Id.*, F.F. No. 10.) In May 1844, the court of quarter sessions confirmed a report setting forth the new boundary line.

Among the evidence presented to the commissioners was the testimony of surveyors engaged by the respective townships in support of their proposed boundaries: Stanley D. Kimberly, P.L.S., for Woodward Township, and Fred M. Henry, P.L.S., for Dunnstable Township. (*Id.*, F.F. No. 5.) Neither surveyor could find the southernmost point of the 1841 boundary line between the two townships. (*Id.*, F.F. No. 7.) The two surveyors proposed boundary lines which started from a common point on an island in the Susquehanna River, proceeding north to a stone monument which marked the former site of a maple tree (denoted in the 1844 court

---

[5] A "perch," in surveyor's terms, is 16.5 feet. Thus, 170 perches equal 2,805 feet and 780 perches equal 12,870 feet.

of quarter sessions' order as a "sugar," which both surveyors said meant a maple) (*Id.*, F.F. Nos. 11-12), and then diverged. From the site of the maple tree, Kimberly's proposed boundary line went due north, then turned due west, then turned due north again. (*Id.*, F.F. No. 13.)

Henry, on behalf of Dunnstable Township, proceeded from the assumption that the 1843/1844 surveyor would have left monuments to mark the division line. (*Id.*, F.F. Nos. 14, 16.) Henry searched for such monuments, which he believed that he found, and used those to reconstruct a boundary line that tacked slightly westward from due north with two turns, before turning 90 degrees, slightly to the south of due west, for a distance of 170 perches.[6] (*Id.* at Discussion, p. 12.) Henry's proposed boundary line generally matched the Clinton County GIS line. It is noted that no personnel from the Clinton County GIS Department testified at the hearing. (*Id.* at p. 4, F.F. No. 6.)

A majority of the commissioners ultimately found Kimberly more credible, rejecting the assumptions and findings of Henry's survey and recommending to the trial court that the Kimberly line be adopted. Dunnstable Township filed exceptions which the trial court ultimately dismissed. The instant appeal to this Court followed.

On appeal, Dunnstable Township raises the following issues, paraphrased for the sake of concision and to conform to the arguments presented:

> 1. The commissioners erred by failing to recognize two cut stone monuments which Dunnstable Township

---

[6] Henry further used a 1918 map by the Commonwealth's Department of Forestry to find the northernmost point of the boundary of the townships and reconstructed the northern portion of the boundary by connecting that point to the western end of the 170-perch east-west line.

asserts take precedence over any other description or source.

2. Woodward Township is attempting to illegally "annex" a substantial portion of Dunnstable Township, which would require a referendum.

3. The 1844 court-ordered description of the change in boundary line between the two townships had bearings and distances consistent with the findings of the Henry Survey and did not indicate that the lines were "due" north and "due" west as indicated by Kimberly.

4. The commissioners failed to take into consideration evidence of acquiescence.[7]

Dunnstable Township's first and third issues, which are essentially to the effect that the commissioners erred in relying upon Kimberly's findings over Henry's, may be addressed together. Dunnstable Township first argues that the commissioners erred in "fail[ing] to recognize any cut stone monuments, of the same size and shape" as a monument that both surveyors recognized (a stone marking where a maple tree stood), which it contends should take precedence over any descriptions in the 1844 order. [Dunnstable Twp. Br. at pp. 23-25 (citing authority).] Dunnstable Township argues that because the 1843 commission had as a member a surveyor and the 1844 board had as a member a civil engineer, "[i]t is logical to assume that these professionals required some type of bearings and distances and would have monuments on the ground in order to establish the boundary. The placement of the cut stones on the ground is logical along fencerows, and not the middle of fields, where they can be easily destroyed, or not be easily located." (*Id.*

---

[7] The issue is listed in Dunnstable Township's brief as "Woodward Township had the burden of proof and failed to prove the line established by GIS should be changed, in accordance with the vote of one of the [c]ommissioners." (Dunnstable Twp. Br. at p. 8.) However, the argument presented concerns evidence of acquiescence. (*Id.* at pp. 32-35.)

5

at p. 26.) Dunnstable Township contends that the Kimberly line was "just a line on a map, without any field work." (*Id.* at p. 27.)

Dunnstable Township also argues that the 1844 court of quarter sessions' order had bearings and distances consistent with the findings of the Henry Survey and did not indicate that the lines were "due" north and "due" west as indicated by the Kimberly Survey. (*Id.* at p. 30.) Dunnstable Township generally asserts the superiority of Henry's methods, which included searching for and finding two additional cut stones (besides the agreed stone marking the site of the maple tree) and the establishment of a northern point of the original boundary between townships through the use of a 1918 Department of Forestry map. (*Id.* at pp. 31-32.) Dunnstable Township compares these favorably to the Kimberly Survey, which did not rely upon monuments or seek a northern ending point for the boundary.[8] Dunnstable Township also notes that Henry produced an extensive written report and Kimberly did not. (*Id.*) Dunnstable Township argues that the methods available to measure directions and distances available in 1844 make it "virtually impossible to believe" that the intent of the parties in establishing the line was to make it "absolutely 'due' north zero degrees and perfectly 'due' west at 270 degrees." (*Id.* at p. 32.)

The Commissioners specifically rejected Henry's testimony concerning the monuments, finding the following as fact:

> 14. In the retracement survey performed by Henry, Henry established certain "search zones," where he searched for monuments that would indicate where the

---

[8] As depicted on Woodward Township's Exhibit 1, which depicts the disputed area, both lines would terminate at the border of Gallagher Township, which adjoins both Dunnstable and Woodward to the north.

surveyor of 1843/1844 marked the division line for the annexed territory.

15.    No evidence was presented to the Board of Boundary Commissioners that the surveyors of 1843/1844 placed any monuments along the boundary line in 1843/1844.

16.    Henry assumed that the original surveyors of 1843/1844 were setting monument stones at every 3,030 feet. (Transcript Page 61, Line 7).

17.    No evidence was presented to the Board to support this assumption by Mr. Henry.

18.    The original source documents did not recite or state where any monuments were set by the original surveyors in 1843/1844. (Transcript Page 62, Line 14).

(Comm'rs' Report at pp. 5-6, F.F. Nos. 14-18.)    The commissioners buttressed Kimberly's finding of a straight north-south dividing line by referring to the 1841 document creating the initial boundary: "The source document for this portion of the boundary line between Woodward Township and Dunnstable Township as depicted on Woodward Township's Exhibit 6, Page 2 of 5,[9] clearly shows the north-south line being straight; there are no deflections in the north-south line, and the [1844] line runs parallel to the original 1841 division line between Woodward Township and Dunnstable Township." (*Id.* at 6, F.F. No. 21.)

In its discussion, the commissioners reasoned as follows:

Where monuments are doubtful, courses and distances are more reliable. [*Will v. Piper*, 134 A.2d 41 (Pa. Super. 1957)]. The Board can find no evidence that the monuments utilized by Mr. Henry to justify deviations from the strict northerly line were intended for that

---

⁹ Woodward Township's Exhibit 6, as well as several other exhibits, are omitted from the reproduced record but appear in the original record.

7

purpose. To the contrary, the stones were found in fence rows and there is no evidence to indicate the stones were placed by the surveyors of the original boundary line between Dunnstable and Woodward Townships. Indeed, during the view of the boundary line, although set stones were viewed by the Boundary Commissioners, the set stones did not appear to have any relation to the boundary line between the Townships. Rather, the set stones viewed by the Boundary Commissioners were in fence rows between private properties.

(*Id.*, Decision and Report, p. 12.)

When a trial court appoints commissioners to determine the location of a municipal boundary, they serve as the fact-finder and possess the exclusive prerogative to determine the weight of the evidence presented. *Adams Twp. v. Richland Twp.*, 154 A.3d 250, 258 (Pa. 2017). The commissioners' determination "has the force and effect of a jury verdict and, therefore, when there is legally competent testimony to support the order, it will not be disturbed by a reviewing court." *Id.* at 258-59 (2017) [quoting *Robinson Twp. v. Collier Twp.*, 303 A.2d 575, 577 (Pa. Cmwlth. 1973)]. A reviewing court may not disturb the commissioners' determination unless they committed an error of law or their conclusion was not supported by competent evidence. *Id.* at 259; Section 303 of the Code, 53 P.S. § 65303 (when a board files its report and recommendation with the appointing court, "it shall be confirmed *nisi*"[10]).

Dunnstable Township's arguments concerning the superiority of Henry's Survey are addressed to the *weight* and *credibility* given to Kimberly's

---

[10] The Latin word for "unless," *nisi* means "([o]f a court's *ex parte* ruling or grant of relief) having validity unless the adversely affected party appears and shows cause why it should be withdrawn." *Adams Twp.*, 154 A.3d at 259 n.11 [quoting Black's Law Dictionary 1207 (10th ed. 2014)].

testimony and the evidence supporting it, not its competency. As correctly stated by the trial court, our decision is "a simple one—to determine if the decision of the [c]ommission[ers] is in fact supported by competent evidence, or if an error of law is present." (*See* Trial Ct. Corrected Op. at p. 1.) While Dunnstable Township might vigorously argue that a different view of the record would reach a different result, it is not for this Court to set aside one set of assumptions—supported by record evidence and, significantly, the commissioners' view of the land involved and alleged monuments on site—in favor of another set. Thus, these arguments must fail.

Dunnstable Township's second issue is that Woodward Township is attempting to "illegally annex" a substantial portion of Dunnstable Township which it contends would require a referendum, citing *In re Alterations of Lines of Indiana and Shaler Townships*, 95 A.2d 506 (Pa. 1953) (*In re Alterations of Lines*), in which our Supreme Court held that annexation could not be accomplished by proceedings for alteration of boundary lines.

Woodward Township differentiates this matter from *In re Alterations of Lines*. It notes that *In re Alterations of Lines* involved two cases where petitions were brought under a now-repealed provision of the Second Class Township Code, referred to as the "Alteration of Lines Section," to alter the lines between the Townships of Indiana and Shaler, *see Petition for Alteration of Lines of Indiana and Shaler Townships*, 92 A.2d 241 (Pa. Super. 1952), and to annex a portion of Buffalo Township to East Buffalo Township, *see In re Boundary Line Between Buffalo and East Buffalo Townships Union County*, 92 A.2d 246 (Pa. Super. 1952). Former Section 302 of the Second Class Township Code, permitted a court of quarter sessions, upon petition, to "alter the lines of a township and any adjoining township,

9

borough, or city so as to suit the convenience of the inhabitants thereof."[11]  The Supreme Court, noting the statutory provision of specific notice and voting requirements for annexations, held that the Alteration of Lines Section could not act as a substitute for annexation.  *In re Alterations of Lines*, 95 A.2d at 509.[12]

Woodward Township further notes this Court's holding in *In re Establishment of Boundary Between Collier Township and Robinson Township*, 360 A.2d 841, 842 (Pa. Cmwlth. 1976), that the failure of the General Assembly to

---

[11] Section 302 of the Second Class Township Code, Act of May 1, 1933, P.L. 103, *repealed and replaced by* Section 302 of Act of Nov. 9, 1995, P.L. 350, 53 P.S. § 65302 (current law).  *See* Section 3701(c) of Act of Nov. 9, 1995, P.L. 350, 53 P.S. § 68701(c) ("[a]ll other acts and parts of acts inconsistent with this act are repealed").

[12] The Supreme Court discussed the differentiation between an "alteration of lines" under the Alteration of Lines Section and an "annexation" as follows:

> What . . . are the factors marking the difference between proceedings to effect an 'annexation' and proceedings to effect an 'alteration of boundary lines'? They would seem to be, first, the amount of the territory involved in the change, and, second, the real objective to be accomplished. Ordinarily the desire to alter a boundary line arises because of some dispute in regard to it, or because it may be uncertain, or may happen to divide an owner's land, or may so awkwardly meander in its course as to require straightening, the change in each of these cases involving but a comparatively negligible detachment of territory on the one side and its addition to the other side of the original boundary. Where, however, the avowed purpose to be accomplished is to detach from the one political subdivision a substantial portion of its territory and to annex it to the other, the reason for the change being based on some such consideration as relative school facilities, questions of taxation and assessed valuations of property, social conveniences, or the like, the proceeding becomes obviously one of annexation and the alteration in the boundary line merely incidental to the accomplishment of the larger objective.

*In re Alteration*, 95 A.2d at 507-08.

comply with a 1968 Amendment to the Pennsylvania Constitution[13] to enact uniform legislations regarding changes to municipal boundaries "would invalidate all preexisting statutory provisions establishing procedures for boundary changes," resulting in the only constitutionally valid procedures for making boundary alterations being initiative and referendum. *Id.* at 842; *see also Middle Paxton Twp. v. Borough of Dauphin*, 308 A.2d 208, 211 (Pa. Cmwlth. 1973) (deeming invalid the statutory annexation procedure under former Section 427 of the Borough Code[14] because Article IX, Section 8 "necessarily abrogat[ed] the preexisting legislation sought to be replaced"), *aff'd*, *Derry Twp. Supervisors v. Borough of Hummelstown*, 326 A.2d 342 (Pa. 1974).

Woodward Township argues that the current Section 302 permits parties only to petition the courts of common pleas to "require the lines or boundaries of townships to be ascertained," with no provision to *alter* a boundary line. Thus, Woodward Township asserts that "there is no longer a concern that a boundary line dispute brought pursuant to [Section 302] will cause a township to be illegally annexed, as the commission's sole duty is to ascertain, or determine, the location of a municipal boundary, not to alter, or move the location of a municipal boundary." (Woodward Twp. Br. at p. 14.)

While it cannot be ruled out that a municipality might attempt to misuse the current provisions of the Second Class Township Code to annex a portion of another, there is no evidence here that such is the case. In 1843, residents of Dunnstable Township sought to have a portion thereof annexed into Woodward

---

[13] *See* Pa. Const. art. IX, § 8.

[14] Section 427 of Act of Feb. 1, 1966, P.L. (1965), *as amended*, *formerly* 53 P.S. § 45427, *repealed by* Section 30 of Act of May 17, 2012, P.L. 262.

Township.  In 1844, pursuant to its authority at the time, the court of quarter sessions granted that relief.  Thus, there can be no dispute that an annexation took place—but in 1844, not 2020.  While the annexation might have been substantial, and impermissible under current law, those issues are not properly before this Court.

Finally, Dunnstable Township argues that Woodward Township failed to prove that the boundary line should be changed, citing the doctrine of acquiescence,[15] which was recognized by our Supreme Court in *Adams Township*, 154 A.3d at 266.  Dunnstable Township points particularly to the testimony of Sergio Esposito, who owns properties on both sides of the line as indicated by a survey in 2008, and constructed a house in 2009 intending that it be in Dunnstable Township, which would now be in Woodward Township as a result of the commissioners' decision.  This argument, too, must fail, as the Supreme Court held in *Adams Township* that "ascertainment of the true location of the boundary is the primary

---

[15] Although Pennsylvania law recognizes the doctrine of acquiescence, there seems to be little in our cases defining with specificity what the doctrine is.  In *Moon Township v. Findlay Township*, 553 A.2d 500 (Pa. Cmwlth. 1989), this Court quoted a treatise definition of the doctrine which is sufficient for current purposes:

> Although contrary authority exists, long acquiescence in the location of municipal boundaries by the [municipality] and the inhabitants thereof where all municipal action and improvements have been done under the assumption that such are the boundaries will support the conclusion that such are the true boundaries, notwithstanding they were not originally so located. Particularly is this true where there is doubt as to what the true boundaries were in fact, or as to the legality of their establishment, or where personal, civil, and political rights have become affixed according to the boundaries established by usage.

*Id.* at 504 [quoting McQuillin, The Law of Municipal Corporations § 7.09 (3d ed. 1988)]; *see also Adams Twp.*, 154 A.3d at 265 n.15 (setting forth authority in other jurisdictions adopting the doctrine of acquiescence).

means by which such disputes may be resolved," and only when a boundary cannot be determined based upon the evidence should resort be taken to "equitable considerations such as the doctrine of acquiescence." *Id*. While the commissioners did note evidence of acquiescence, (*see* Comm'rs' Report, Decision and Report at p. 13), they considered resort to such evidence unnecessary given their finding that the Kimberly line was the true boundary line between the townships. Given the primacy the Supreme Court has assigned to evidence of the true location of the boundary line, and the finding of such competent evidence here, there are no grounds to disturb this determination.

In light of the foregoing, the corrected order of the trial court is affirmed.

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Woodward Township Municipal    :
Corporation of Clinton County,    :
Pennsylvania    :
    :
    v.    :  No. 704 C.D. 2020
    :  No. 733 C.D. 2020
Dunnstable Township Municipal    :
Corporation of Clinton County,    :
Pennsylvania,    :
    Appellant    :

# **O R D E R**

AND NOW, this 12th day of May, 2021, the corrected order of the Court of Common Pleas of Clinton County is AFFIRMED.

 

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita